The next case is Club Exploria v. Aaronson, Austin, PA. Thank you, Your Honor. Good morning, counsel. Mr. Smith? Good morning. Yes, and may it please... Are you prepared? I am, Your Honor, yes. Thank you. You may proceed. Thank you. May it please the Court, there is only one issue this Court really needs to decide. Whether Aaronson was entitled to summary judgment on Exploria's claims of tortious interference as to the four affected owners that both sides agree were raised in the amended complaint. Exploria's legal burden on this issue is not onerous. To survive summary judgment, Exploria simply needs to show or produce enough evidence showing that Aaronson interfered with its contracts by influencing one of these four affected owners to breach. There's more than sufficient evidence to warrant a trial on this issue. What evidence is there? Because you have... I mean, I looked at the record. There's no evidence that he suggested to any of these owners to stop paying, to stop payment. That is correct, Your Honor. But we do not need to show that there was an explicit direction to stop payment. The standard here is influence. The Florida... But in your interrogatory answers, interrogatory number seven, I believe it was, you were specifically asked how did Mr. Aaronson breach the contract, have the affected owners breach the contract. And the thing, the answer was that he had them stop payment. Was that not correct? Yes, he did, that he convinced them or influenced them to stop payment. But it does not require an explicit direction for that, Your Honor. The complaint itself alleges a broader theory that's in paragraph 66 and throughout the complaint. And we certainly move for summary judgment on the basis that there was an influence here. And that's the legal standard that Florida say is required in this case, which is whether or not there is an influence to breach. That's in FARA versus Canada, which is 740 Southern 2nd, 560. It also is the standard that this court discussed in mortgage now versus guaranteed home mortgage. That case is unreported. It's at 545 F Appendix 809. That case is interesting because the issue there was whether defendants tortuously interfered with employment contracts of the plaintiff. And this court held that it was enough that the defendants influenced the employees with negative comments about plaintiff and its business, which generated fear and caused the employees to breach. Now, let me walk through the evidence in this case as to the four affected owners that both sides agree are at issue. And I'll start with affected owner three, that's Ms. Schupp. Because we can demonstrate with respect to all four of these affected owners that they were influenced by Mr. Aronson to breach. So during Ms. Schupp's deposition, she was asked, did you believe that by hiring Mr. Aronson, you would no longer have to make the mortgage payments or the maintenance fee payments? And she responded, I'll say yes. I believe that. That's at 126.2 and it's transcript pages 73 to 74. A rational jury could credit this testimony and conclude that Aronson influenced Ms. Schupp to breach for three reasons. First, after Ms. Schupp's husband viewed the website and had a conversation with someone at Aronson's firm, Ms. Schupp, quote, believed that Aronson- This is you're talking about owner number three? Owner number three, yes, your honor. Right, but didn't owner number three stop making payment because things were a waste of money? Your honor, she did say that, but there's conflicting inferences in the record and in the non move as the non-movement. We are entitled to all favorable inferences. She said she was asked why she believes she stopped making payment or if she could no longer make payment from hiring Mr. Aronson. And she said, yes, I believed that. And so I don't think those two did not stop making payment until after she hired Mr. Aronson. And walking through that evidence, again, she was led to believe after her husband talked to the firm and viewed the website that Mr. Aronson could affect a rescission. She was copied on a letter and sent a draft according to record evidence that Mr. Aronson purported to provide notice of cancellation and rescission. And she stopped making payments only after she hired Mr. Aronson. And there's a little bit of a dispute on that point. And so I just want to refine that last point. She engaged Mr. Aronson on January 8th, 2018. She failed to pay her maintenance fee payment on January 22nd afterwards. That's established. In addition, although her loan payment was due on January 2nd, the record establishes that it was not late until January 12th, 10 days later. There was a 10-day grace period. That's in tab 32, docket 159-29, and it's on page 8. With respect to both of her obligations, she was not late until after she hired Mr. Aronson. Here's a concern I have about your argument. You're basically saying, and I don't mean to characterize it, but you're basically saying that because these folks hired a lawyer because they didn't like their contractual arrangement, they wanted to explore getting out of it, that that creates a tortious interference claim against the lawyer. I mean, isn't that how you're asking us to read this evidence? Is that because these people hired a lawyer because they didn't like this contract, that the lawyer's liable? No, your honor. I think that's how the other side is characterizing the evidence. I think what we are pointing to is repeated assertions by Mr. Aronson that he could affect a cancellation or rescission of the contract, giving the clients confidence that they could breach without consequence. And so to go through... Let me just give you this hypothetical. I mean, let's just say the evidence was that these individuals didn't like their contracts. They thought they were defrauded. They called a lawyer. The lawyer looked at the situation and said, yeah, you've got a decent claim. You might have been defrauded. And then the individuals stop, you know, breached their contracts on that basis. I mean, that's your tortious interference claim, right? I mean... It's not because I think there are distinctions. What's the distinction then? So the distinctions are that these lawyers, or excuse me, this lawyer advertised that essentially for all timeshare owners, they have a good chance of effectuating a cancellation or rescission. He then takes their case and blesses this opinion as to these particular plaintiffs by sending a notice of cancellation or statutory rescission out to my individuals where he says that it doesn't matter what the contract says. You can get out of them. That's what he testified to. And in addition, all of them stopped making payment after hiring him. And at least in the case of Ms. Schupp, which this court has to credit because we're the non-movement here, she said that, yeah, she believed that. She believed that she could stop making payment because she... Mr. Smith, I'm concerned about where your argument would go in other contexts, especially during the downturn, the unpleasantness we suffered as a country over three or four years. There were a lot of lawyers who advertised that they represented mortgage borrowers or other kinds of creditors. And our circuit was flooded with cases literally in which the borrower stopped paying the mortgage after hiring the lawyer. You'd make the same argument there, wouldn't you? I don't think so, Your Honor. What's different? Just having temporal proximity I don't think is enough. What sets this case apart is... The advertisements in these cases, the lawyers are representing that we're entertaining clients who are mortgage borrowers and it's a downturn. So everybody's in trouble or dissatisfied somehow or another with their situation and they stop paying. Why wouldn't those cases on summary judgment all be set aside and go to trial? Because I think there's additional plus factors at issue here that I was discussing with Judge Brasher. The idea that you represent to all these clients that they have a good chance of not having to... That they can rescind their contract. That's number one. Counselor, let me ask you a question because I'd like to make sure that we are both on the same page as to what the record actually reflects, okay? And affected owner number three is Cynthia Shook, is that correct? That's correct, Your Honor. This is her deposition. Why did you stop making payments on the loan? I stopped making payments on the loan because I felt it was a waste of money. And could you and your husband afford to make those monthly payments? We were having a little bit of hardship because my husband's disabled. He had seven herniated discs so he doesn't work. Things were getting tight and we were squeaking by, okay? But I decided that we weren't going to use it. This person was specifically asked, did anyone from the Aronson firm ever tell you to stop making the loan payments? No. I don't disagree with any of that, Your Honor. That's certainly in the record. What I would tell you is that as the non-movement entitled to all favorable inferences in this case, Ms. Shook never missed a payment until she hired Mr. Aronson. And there's more than that. In addition... Mr. Aronson sent a letter saying, by surrendering their interest with your company, we ask that they will be relieved of any further obligation on her contract. Question. So as of November 7th of 2018, was it your belief that you were still obligated under the contract? Witness. Yes. And Your Honor, in response to that, what I would say is Ms. Aronson testified that because of... or excuse me, Ms. Shook testified that because hiring Mr. Aronson, she believed, quote, the Aronson firm could affect a rescission, that is, a cancellation of her timeshare obligations. And she believed that by hiring Mr. Aronson, she would, quote, no longer have to make the mortgage payments or the maintenance payments. There is nothing in the record that supports that statement, counsel. And honestly, you're an officer of the court. I take that very seriously, Your Honor. Counsel, that's the same situation in these cases I described to you in a hypothetical. And I'm sorry, Your Honor, I'm not familiar with the facts. Those mortgage cases I'm talking about and other kinds of creditor cases, it's the same scenario that we just covered. They're dissatisfied. Yes. Dissatisfaction alone is not enough. I agree with that. I think that what we have to prove is something more than that, that they were convinced or influenced by the lawyer that they could rescind and that they, in fact... Every time they hire a lawyer in those circumstances, they're looking forward maybe of getting out from the predicament they don't like. That is correct, Your Honor. And that would go to predisposition, which I think is a slightly different issue. No, no, no, but you draw the inference afterwards. What I'm saying, you get a fact issue. I'm concerned about all these cases being tried before a jury and... Because you could infer this or you could infer that. Yes, Your Honor. I think more is required and I think... What exactly, pin it down, was the plus here? I think the plus... In light of the testimony that Judge Legault had just read. The plus here is that the clients were convinced that their contracts could be canceled and that Mr. Aronson purported to effectuate a rescission or cancellation. And that's the case in lots of cases we've seen. The client was convinced that the lawyer could get the client off the hook. So the client quits paying. Yes, Your Honor. And I think under Florida law, that's actionable then because the standard is whether or not they influenced the customer to breach. That's why I asked the question because what you propose that we do would be very wide sweeping and cover lots of other areas in which you have a debtor-creditor relationship and you have a debtor going to a lawyer. Yes, Your Honor. And I think that... And what happens afterwards is there's a default. Yes, and it's what... I totally understand Your Honor's concern. Speaking to the standards under Florida law... That's why I'm looking for some narrow thing in your case which puts it away from all these other cases. Do you follow me? Yes, Your Honor, I do. I've gone well over. I will save time for rebuttal. Thank you. May it please the court. Good morning still. Chuck Meltz on behalf of the appellees, Austin Aronson and Aronson Austin, PA. Judge Lagoa, to your question about the interrogatory question and response, the theory that was articulated by Exploria was that there was an active procurement of breach by my client, specifically that my client told his clients, who had retained him as a lawyer, to stop playing Exploria for improper purposes. And quite frankly, we never... That was their interrogatory response, was it not? It was. Interrogatory response number seven described how defendants intentionally procured breaches and their response was once retained, defendants encouraged the affected owners to breach their obligations based on legal theories defendants knew or should have known to be frivolous. And the active words would, of course, be encourage the effective owners to breach. And from the moment this case was pled through the interrogatory responses, when you compare those to the actual discovery that took place in this case, the deposition testimony of the two affected owners who were deposed as opposed to anyone else, there was never, never any testimony that Mr. Aronson or anyone from his firm told any of their clients to stop paying. There was no testimony that any of these individuals in the affected owner category followed some guidance to stop paying or that the act of stop paying was some sort of legal theory that was designed to solicit a response on Exploria's behalf. From the time this case was filed through the close of discovery, and I would point out, Your Honor, that there were no limitations on what affected owners to depose. Exploria only elected to depose two of the six that they actually identified in their complaint. They didn't even take all 10 depositions as they were entitled to. And in addition to that, you asked specifically in your interrogatories to Exploria to list any and all people who were affected owners, and they only listed six. Well, to clarify that, Judge, they pled six. So when you look at both the complaint and the Yes, their complaint only has six, correct. Yes, you're correct. So they identify affected owners one through six. We served at interrogatory. Please tell us the owners one through six. And at no point in time, either in the complaint or the amended complaint, which was a number of months later, did in the tortious interference count, they ever expand beyond those six individuals. And unlike some of the other cases within the middle district that they cite to, or they look at more circumstantial evidence, more indirect evidence, evidence other than simply what the owners testified to, not only was there direct testimony from the two affected owners that they were never told to stop paying. But additionally, Exploria never presented any type of statistical evidence, statistical expert. They never presented a market research expert. They never presented anyone who somehow linked what they asserted was these theories or statements or website representations or anything else that somehow created this implicit expectation or understanding in any of the expected owners that caused them to take some sort of action. In fact, the only evidence, and that's perhaps a bit of a stretch, in Exploria's response to our motion for summary judgment was to point out that Aronson, quote, had a history of telling his clients not to pay. And there's a footnote to that. I believe it's footnote 89. And footnote 89 then cites to the testimony of a single person, Kenneth Feldman, who was a non-Exploria owner that was actually deposed in another case involving Mr. Aronson. And to be clear, when Mr. Aronson was deposed as a corporate representative of his firm, he was asked from 2016 to 2019, how many folks have you represented who have had issues with their timeshare? His answer was 1,500. And from that category of 1,500, Exploria points to in their briefs one person, one person who they claim Mr. Aronson actually told to stop paying their timeshare. And to that point, your honors, and we cite this in our briefing, that's not even what Dr. Feldman said. It's Kenneth Feldman. He's a dentist, so he's Dr. Feldman. When Dr. Feldman was deposed, Dr. Feldman was asked about why he stopped paying, and he described a phone call that he had with Mr. Aronson. And the phone call he described was, I'm not using this timeshare. I really can't afford it. I really don't want to pay it. So I called Mr. Aronson. Mr. Aronson answers the phone. Mr. Aronson, I really don't want to pay this timeshare anymore. Mr. Aronson says, okay. Dr. Feldman says, well, what do you think about that? Mr. Aronson says, well, is that something that you really want to do? And Dr. Feldman says, yes. Mr. Aronson says, fine with me. And that exchange somehow got committed to Mr. Aronson instructs people to stop paying their timeshares, that he instructs them under some legal theory that it will accomplish something, and that's simply not the case. So not only do we not have any evidence from an Exploria owner that they were somehow misled or directed or encouraged in some way to stop paying their timeshare, but the key evidence cited by Exploria, which is Dr. Feldman's testimony in a total other matter, Dr. Feldman was a Diamond Resorts owner, that doesn't stand for that proposition either. So in trying to extrapolate, in trying to piece together, if we're going to take something other than the actual owner's testimony as to why they stopped paying, that something other doesn't exist. And as Judge Antoon pointed out in his order granting summary judgment, it's not like we have two competing sides here. We have one side where there's a complete absence of evidence to identify that a breach was procured by Mr. Aronson or anyone in his firm. And on the other side, we have an argument, and that argument is asking the court, both then and now, to make an enormous conclusion and an enormous extrapolation, not based on scientific testimony, not based on expert opinion, not based on statistical analysis, but literally based on a very of an interpretation of what Dr. Feldman was told and based on the fact that some people stopped paying their timeshare after they retained Mr. Aronson. If you were to read the complaint, the complaint would suggest that always these people stopped paying their timeshare after they retained Mr. Aronson. Once again, we put a chart in our briefing that actually showed many people stopped paying their timeshare before paying Mr. Aronson or hiring Mr. Aronson. Many people continued to pay their timeshare for months and months and months after they hired Mr. Aronson. On a few occasions, some people stopped paying within a few months or two, but there was never any pattern. There was never any practice. There was never any strategy. There was nothing that would somehow show that there was a relationship between Mr. Aronson's retention and someone stopping payment. And Judge Brasher, to your point, and Judge Schoflat, to your point, it's not unusual that individuals who would retain a lawyer to help them get out of their timeshare would not be paying on their timeshare. If someone was happy and satisfied and enjoying the full benefits of their timeshare, it's difficult to imagine why they would reach out to Mr. Aronson. Well, there's an old common law doctrine, I think, that Justice Holmes espoused, which is that a contracting party has a right to breach. Yes. Are you familiar with that? I am, Your Honor. All right. So the fact of the matter is, regardless of what a lawyer says, well, a lawyer could say that to a timeshare owner. You're dissatisfied and they want to get out, basically want to breach. I don't know that would be an atrocious act, simply telling the timeshare owner that under some versions of the law, depending on the state, I suppose, you have a right to breach, but you might have to suffer the consequences. Of course, all of them were subject to the consequences that the plaintiff could visit on them for not paying. Yes. They're not remedy-less, not without remedy. Correct. They have a remedy for the breaches. Yes, Your Honor. Nothing, well, we never even got that far in the trial court. Well, that's the same thing in all these mortgage cases. You're familiar with all those. I am, Your Honor. And there are others during the downturn, all kinds of cases involving bankrupts or would-be bankrupts. Yes. So, Your Honor, to your point, a lawyer can tell a client to breach their contract. And for tortious interference to be established, you would have to show that that procurement of a breach was unjustified. And typically, when we talk about tortious interference, most often it doesn't involve an attorney representing their client because, of course, the attorney is the agent of the client and the attorney can't even be in a position to tortiously interfere with the contract when they're giving that advice. Once again, we didn't make it to those additional steps here. But had we made it to those additional steps here? What the record also showed, to your point, Judge Choflat, is that there were contracts in place between Exploria and affected owners 1 through 6. Affected owners 1 through 6 all clearly did not want to own their timeshare with Club Exploria anymore. And it's also undisputed in the underlying record. That wasn't because Mr. Aronson solicited them or put a thought in their mind or took them from a place of satisfaction to dissatisfaction. As the record evidence shows, Mr. Aronson doesn't mass advertise. He doesn't have radio ads. He doesn't have TV ads. You have to find him. And as the court noted, most of the individuals who were affected owners found him based on a referral from another lawyer. So, they had already gone to another lawyer. That lawyer said, gosh, I can't handle you. Let me get you to Mr. Aronson. Advising a client to breach a contract is certainly reasonable advice as long as the attorney explains the risks and benefits. These are the risks and benefits. This is what the contract will then subject you to. These are the penalties. These are the potential defenses. And here's the economic result of all of that. Because what the record evidence also is clear in this case is that Club Exploria did not have a buyback program. They had a surrender program, as they called it, that was entirely discretionary. The Club Exploria individuals who were all deposed discussed how they, on their own, first tried to contact Club Exploria, tell them of their hardships, tell them of their inability to use this product. Got no relief. There's no market to sell these timeshare interests. I think one affected owner actually had upgraded their timeshare and wanted to go back to their original deal. Yes, Judge, go ahead. And Exploria just refused to contact them. So in the three minutes that I have left, just because I find this interesting and perhaps no one else will, Exploria, like a lot of other timeshares, would acquire new properties typically by acquiring already existing timeshare structures. And what would frequently happen is you would have people who would have designated weeks. So someone might have a week in December, someone might have a week in January for a two-bedroom or three-bedroom, use it every year. What Exploria would do is they would come in and they would take over and then they would have owner meetings with these people and say, you know what, your one week's great, but why don't you cash that in for Expos? And Expos were Club Exploria points. Because if you use Expos, rather just having to spend the one week at your place every year, gosh, doesn't that get boring, you can go all across the country and maybe even all across the world. And then what would happen is people would give up their dedicated weeks that they were using and could use all the time and they would try to make reservations under these Expos and find that that was very difficult or they were having to go places at times that they didn't like and so on and so forth. So yes, in that one affected owner's place, they just wanted to go back to what they had, but even that was an option that Club Exploria would not give them. So when you have individuals like the affected owners, and forget the record evidence that doesn't exist to show tortious interference, but when you have those individuals and they're presented with essentially two choices by Club Exploria, pay us or pay us, and they in fact that was a decision they wanted to make or if that was a decision that a lawyer suggested they make, would be a perfectly reasonable decision given the facts of their circumstances because the costs of that would be identified by the contract and if the costs of that were less than paying maintenance fees in perpetuity, it would be a perfectly reasonable and fine obligation for any lawyer remotely understanding of these issues to We never even get that far because Exploria never linked anything that Mr. Aronson did, said, suggested, advertised, put on a website, put in a blog or anything like that, but never once demonstrated there was a link between that and their actual stopping of payment. And your honors, I don't believe Judge Antoon struggled with this record. I don't believe the record on appeal is a struggle either. The summary judgment should be affirmed. We didn't really talk about the denial of the motion to amend, but I would simply add in my 25 seconds that when you first ask relief to amend after judgment has already been entered against you, that's too late and certainly doesn't meet the good cost standard and the denial of the motion to amend certainly was well taken by the underlying district court as well. If there's no other questions, thank you for your time. Thank you, counsel. Mr. Smith. You have three minutes remaining. Thank you, your honor. Just to make two very brief points, your honor. First, with respect to interrogatory response number seven, the statement says encouraged. We did not use the word directed or instructed and the district court itself recognized that caused the owners to believe that they no longer needed to make payments. That's in his order at page 10. I think that between the complaint and the motion for summary judgment, we made clear that we weren't pinning our case entirely on an explicit obstruction. Let me go to your point, Judge Choflat, about how do you sort out these cases from other ones that this court has seen. I think that goes to the element of legal privilege. For example, if a lawyer encourages either directly or indirectly a client to breach, the question is whether or not the lawyer . . . Is there any doubt in this case that all the clients wanted relief? Yes, of course, because they sought out this lawyer. That's absolutely correct. At the end of the day, in the evidence in this case, all of them wanted out, didn't they? Yes, that's correct. That's why they sought his advice. They all wanted to exercise a right to breach and suffer the consequences under the contract. Well, I disagree with that last point, Your Honor. Here's why. It's one thing to want to get out of a contract, and it's another to make a decision to breach the contract. I can make a decision that I want to get out of my mortgage, and I can retain a lawyer and talk . . . You don't have any evidence in this case, as I understand it, of what the conversation was between the ones you'd oppose, for example. And Aronson. That's correct. So we don't know what it was. Suppose the client said, we want out. And he explains the consequences of breaching, what the economic consequences would be. And they said, let's go ahead. And so they stopped payment. Sorry, we . . . As a form of breaching. Is that actionable against the lawyer? If the legal advice is frivolous, then I do think it is actionable. We don't know whether the legal advice is frivolous or not. All we know is they want it out at the end of the day. I don't think that's enough. What I think sets this case apart, again, is that the advice here was objectively frivolous. On each of the cancellation notices . . . Is it your argument that they went to see Aronson or contacted him and had no intent at the time to breach? We don't know whether they had an intent to breach. We know that they wanted to get out of their contract. Well, that's the same thing. I don't think so. You either get a rescission or you're sued for breach. One or the other. That's right. I guess the distinction that I'm drawing in my mind, Your Honor, is it's one thing if I go about seeking valid legal process to end a contract lawfully. It's another thing if I engage in, for lack of a better word, self-help and breach on my own. If I'm encouraged by a lawyer with frivolous legal advice to breach, then there is no privilege by that lawyer and the lawyer can be held liable. Thank you very much for your time today. We would ask that you vacate the judgment and remand for further proceedings. Thank you. Thank you, Mr. Smith. Thank you, Mr. Meltz. Thank you. Have a good day.